NOs. PD-0541-1 & PD-0542-1

## TO THE COURT OF CRIMINAL APPEALS

## OF THE STATE OF TEXAS

### LEAVELLE FRANKLIN, PETITIONER

### VS.

### THE STATE OF TEXAS, RESPONDENT

Direct Appeal from the 102nd District Court of Bowie County, Texas
Seeking Review of Opinions Issued by Texas Sixth Court of Appeals
Cause Nos. 06-14-00046-CR & 06-14-00047-CR

## PETITION FOR DISCRETIONARY REVIEW

**Jason Horton**
**jason@jasonhortonlaw.com**
**Texas Bar No.: 24041130**

**JASON HORTON LAW FIRM**
**Post Office Box 1596**
**Texarkana, Texas 75504**
**T-870-216-2051**
**F-870-216-2054**
**www.jasonhortonlaw.com**

RECEIVED IN
COURT OF CRIMINAL APPEALS

June 10, 2015

ABEL ACOSTA, CLERK

**ATTORNEY FOR PETITIONER**

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF THE PARTIES

Pursuant to Texas Rule of Appellate Procedure 38.1, the undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case. These representations are made so that the Justices of this Honorable Court can evaluate whether they are disqualified to serve or should recuse themselves from participation in the decision of this case.

**Trial Court Judge:**
102nd Judicial District Court Judge Honorable Bobby Lockhart

**Defendant/Petitioner:**
Leavelle Franklin

**Attorneys for Defendant/Petitioner at Trial:**
William Williams
Texas Bar No. 24072804
Chad Crowell
Texas Bar No. 24072808
Bowie County Public Defender's Office
424 West Broad Street
Texarkana, Texas 75501

**Attorney for Defendant/Petitioner on Appeal:**
Jason Horton
Texas Bar No. 24041130
JASON HORTON LAW FIRM
P.O. Box 1596
Texarkana, Texas 75504

**Attorneys for the State of Texas/Appellee at Trial and on Appeal:**
Bowie County Assistant District Attorney Samantha Oglesby
Texas Bar No. 24070362
Bowie County Assistant District Attorney Kelley Crisp
Texas Bar No. 24062683
601 Main Street
Texarkana, Texas 75501

# TABLE OF CONTENTS

**Page**

IDENTITY OF THE PARTIES ............................................................. ii

TABLE OF CONTENTS ................................................................... iii

INDEX OF AUTHORITIES ............................................................... iv

STATEMENT REGARDING ORAL ARGUMENT ...................................... 1

STATEMENT OF THE CASE ............................................................. 2

STATEMENT OF PROCEDURAL HISTORY ........................................... 3

STATEMENT OF FACTS ................................................................. 3

GROUND FOR REVIEW ................................................................. 16

Petitioner seeks review of the court of appeals' application of current Texas precedent regarding the admissibility of SANE reports over hearsay objections. Specifically, when are trial courts permitted to "infer" that child claimants understand a proper diagnosis depends on the veracity of the statements they make to sexual assault nurse examiners?

ARGUMENT AND AUTHORITIES ....................................................... 17

PRAYER .................................................................................... 25

CERTIFICATE OF COMPLIANCE ...................................................... 26

CERTIFICATE OF SERVICE ............................................................ 27

APPENDIX (Opinions of the Texas Sixth Court of Appeals)

# INDEX OF AUTHORITIES

**CASES** **Page**

*Bahle v. State*, 2012 WL 1382568
(Tex.App.—Dallas 2012) ................................................................ 22, 24

*Cofield v. State*, 891 S.W.2d 952
(Tex.Crim.App. 1994) ........................................................................... 17

*Duckworth v. State*, 2013 WL 3871058
(Tex.App—San Antonio 2013) ..................................................... 22, 24

*Franklin v. State*, 2015 WL 1043804
(Tex.App.—Texarkana 2015) ........................................................ 22, 23

*Lopez v. State*, 2014 WL 1267249
(Tex.App.—Amarillo 2014) ........................................................... 19, 20

*Martinez v. State*, 178 S.W.3d 806
(Tex.Crim.App. 2005) ........................................................................... 17

*Prieto v. State*, 337 S.W.3d 918
(Tex.App. — Amarillo 2011) ......................................................... 22, 23

*Taylor v. State*, 268 S.W.3d 571
(Tex.Crim.App. 2008) ........................................ 17, 18, 19, 21, 22, 24

*Thomas v. State*, 2013 WL 4516168
(Tex.App.—Austin 2013) ............................................................... 22, 24

## STATUTES and RULES

Texas Rule of Evidence 802 ................................................................. 17

Texas Rule of Evidence 803 ..................................................... 17, 18, 19

## TO THE COURT OF CRIMINAL APPEALS

## OF THE STATE OF TEXAS

LEAVELLE FRANKLIN                                        PETITIONER

VS.

THE STATE OF TEXAS                                      RESPONDENT

## PETITION FOR DISCRETIONARY REVIEW

## TO THE HONORABLE COURT OF CRIMINAL APPEALS:

Comes now the Petitioner, Leavelle Franklin, by and through his attorney, Jason Horton, and respectfully urges this Court to grant discretionary review of the above-named cause pursuant to the Texas Rules of Appellate Procedure.

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner requests oral argument. Oral argument would substantially assist this Court in determining any unresolved factual and/or procedural issues, as well as permit Petitioner's counsel the opportunity to respond to questions the Court may have regarding the consequences of Petitioner's requested relief.

## STATEMENT OF THE CASE

The State joined two separate Indictments in a single proceeding and tried Petitioner on six separate counts of Aggravated Sexual Assault of Child. Petitioner was convicted and sentenced to LIFE in prison on each count. The trial court stacked each sentence within the Indictments but ran the Indictments concurrent with one another, for a total of three consecutive LIFE sentences.

On direct appeal, Petitioner argued that the trial court committed reversible error by (1) permitting the introduction of the SANE reports; (2) concluding that the State did not open the door to cross-examination regarding the alleged victims' inconsistent claims of abuse; (3) permitting an expert to remain in the courtroom in violation of the "Rule;" and (4) overruling Petitioner's objection to the State's improper plea for abandonment of objectivity during final closing argument.

In separate opinions combined for purposes of argument, the Sixth Court of Appeals at Texarkana affirmed Petitioner's convictions. *Franklin v. State*, 2015 WL 1043804 (Tex.App.—Texarkana 2015, reh'g denied); *Franklin v. State*, 2015 WL 1043701 (Tex.App.—Texarkana 2015, reh'g denied). In doing so, the court ruled that Petitioner's trial counsel did not preserve error regarding issue (2), above, and that, although the trial court did commit error regarding issues (3) and (4), said errors were harmless.

2

This Petition is limited to the court of appeals' application of current precedent to issue (1).

## STATEMENT OF PROCEDURAL HISTORY

On March 10, 2015, the court of appeals affirmed Petitioner's convictions in two separate opinions joined for purposes of argument. *Franklin v. State*, 2015 WL 1043804 (Tex.App.—Texarkana 2015, reh'g denied); *Franklin v. State*, 2015 WL 1043701 (Tex.App.—Texarkana 2015, reh'g denied). Petitioner filed a motion for rehearing on March 25, 2015. The motion for rehearing was overruled on April 7, 2015. Petitioner's Petition for Discretionary Review was due on May 7, 2015, and Petitioner timely requested an extension of said due date, making this Petition due on or before June 8, 2015.

## STATEMENT OF FACTS

A.  Trial

Petitioner is the biological father of alleged victims Barbara and Tasha Johnson (pseudonyms). (6 RR 91) At the time of the alleged offenses, Barbara and Tasha lived with their mother, Conesha, and Conesha's boyfriend Bobby. (6 RR 90)

Petitioner would occasionally get the girls on a weekend, usually on a holiday, so it didn't surprise Conesha when Petitioner called and asked if he could have the girls on Easter weekend in 2013. (6 RR 92) According to Google, Easter Sunday was

3

March 31, 2013. Upon their return from visiting Petitioner, Conesha thought it was unusual that neither Barbara nor Tasha hugged her or Bobby when they came in the door. Conesha and Bobby also thought it was unusual that Petitioner did not come in with the girls before he headed back home. (6 RR 81, 93) Later that night, Conesha went to check on the girls after she unexpectedly heard the upstairs bathroom door close. Conesha found Tasha asleep and Barbara in the bathroom. (6 RR 95) Barbara told Conesha that she wiped herself and saw some blood. (6 RR 95) Conesha had Barbara wipe herself again, but no blood was found. (6 RR 96) Conesha testified that she immediately thought Barbara had been molested. (6 RR 97) Conesha asked Barbara if she had been sexually abused, and Barbara shook her head no. Conesha claimed that Barbara appeared scared. (6 RR 97)

Conesha let it go, but at some point later in the week she told boyfriend Bobby that she thought something was wrong with the girls. (6 RR 98-99) She asked Bobby to speak with the girls, and Bobby told her he would speak with them after work the next day. (6 RR 99) Prior to speaking with Bobby, seven-year-old Barbara told Conesha that Petitioner had been "molesting her." (6 RR 101) According to Conesha, Barbara said Petitioner touched her between the legs, and, after speaking with Bobby, Barbara told Conesha that Petitioner put his penis in her mouth. (6 RR 101, 102)

4

Bobby did not speak with the girls until the following Wednesday evening. (6 RR 82) According to Bobby, Tasha told him Petitioner made her put her mouth on his penis, then Petitioner got on top of her and started "hunching." Bobby defined "hunching" as having sex, and he also said "hunching" could be kids "screwing on each other" in the playground. (6 RR 83, 85) Barbara told Bobby that Petitioner put his hand between her legs and was trying to put his finger inside her, and that Petitioner put her on her back and got on top of her. That's when Petitioner told Barbara that she was his new girlfriend. (6 RR 88) After hearing all of this, Bobby called the police. (6 RR 87)

Bowie County Sheriff's Deputy Cole Ogden responded to the call. (6 RR 112) Ogden did not collect any evidence because the abuse allegedly occurred somewhere other than Conesha and Bobby's house. (6 RR 113) Ogden testified that he did not speak with the girls, nor did he retrieve the girls' clothing. (6 RR 113, 116) Conesha told Ogden that she believed the blood Barbara described was from Petitioner disciplining Barbara. (6 RR 117) However, Ogden's offense report claimed that "victim one" came back and said that her father touched her private part. (6 RR 117) According to Ogden, this is why he advised Conesha and Bobby to take the girls to the hospital. (6 RR 117) On redirect by the State, without any objection from Petitioner's trial counsel and no additional evidence introduced in support, Ogden

5

claimed it was his understanding that the girls had been "raped" by their father. (6 RR 118)

According to Record Exhibit 2, the girls were taken to the Texarkana Children's Advocacy Center (CAC) on April 4, 2013. During her CAC interview, Tasha claimed Petitioner touched her private part while she was in the backseat of Petitioner's car. Petitioner was driving the car at the time. Tasha claimed this happened sixteen times. Tasha said her "Paw Paw" was in the front seat talking with Petitioner when Petitioner would reach in the back and touch her private parts. Tasha's clothes were on, and Petitioner touched her on top of her clothes.

Tasha also said that Petitioner touched her private parts on top of her clothes as they rode a motorcycle. As one hand touched her private parts, Petitioner's other hand was in his lap, and all of this happened while the motorcycle was moving. Tasha said that Petitioner only touched her two times and never touched her before that Friday. After identifying various body parts, Tasha said that Petitioner touched her private parts on Sunday in the backseat of a car, and not on the motorcycle. Tasha unequivocally said that (1) no one had ever shown her videos or pictures of naked people; (2) no one had ever touched her privacy under her clothes; and (3) no one had ever made her touch their privacy parts.

Tasha said that Petitioner also reached back and put his hand in Barbara's privacy part while they were in the backseat of the car. The car was moving, and Barbara's shorts were on. Tasha said that she had blood on her privacy part because Petitioner whooped her with a belt on her butt.

During Tasha's interview, CAC forensic interviewer Melanie Hughes left the room to discuss the case with the law enforcement officers who had been watching the entire time. Upon Hughes' return, Tasha again said that no one had ever made her touch a boy's or a man's privacy part, and that no one had ever shown her videos or pictures of people with no clothes on. *See* Record Exhibit 2.

Record Exhibit 2 also contains Barbara's April 4, 2013, CAC interview. Barbara thought she was there to talk about drawing and painting. Barbara said that Petitioner touched her "lips" (part of her face) while at her "Paw Paw's" house, then Barbara said Petitioner touched her lips at Gloria's house. Barbara said she was bleeding on her butt because she did not wipe herself. Barbara said that her daddy's man part touched her lips while they were at Gloria's house. Although Barbara referred to both Bobby and Petitioner as her "daddy," it appears as though Barbara was referring to Petitioner when discussing the incident with the man part.

Barbara said that she was in the living room when Petitioner's man part touched her lips. When Melanie asked Barbara to tell her more, Barbara pointed to a drawing

7

and said "his knees." Barbara said Petitioner's man part went inside her lips and tasted like milk and felt like gum. Barbara drew what a man part looked like, then said Petitioner put his man part in her middle part. Barbara said that she and Petitioner were in Petitioner's room because Gloria, Bobby and Petitioner were fighting after Gloria and Bobby witnessed the alleged sexual abuse.

Barbara said Petitioner flipped her over in the bed and put his man part in her middle part. At first Barbara said they were both clothed, but then she said Petitioner took her clothes off and put them back on. Then Barbara said she went to the doctor because her butt was bleeding after Petitioner whooped her with a belt. She said Petitioner's man part felt soft, then changed the subject and said it was cold in the room. Barbara then said her clothes were on when Petitioner's man part went in her middle part, and this only happened one time. Like Tasha, Barbara said that no one had ever shown her videos of people without clothes on.

Just as she did during Tasha's interview, Hughes left the room to discuss Barbara's interview with law enforcement. When she returned and resumed questioning, Barbara said that nothing came out of Petitioner's man part when it went in her middle part. However, chocolate milk came out when Petitioner's man part touched her lips, and the milk went in her mouth. It tasted like "white." She spit it in a towel and put the towel in the kitchen.

Barbara said blood came out of her middle part and went in her butt. She also said Petitioner laid on her when she was on her stomach, and Petitioner fell asleep on her at some point. This made Barbara feel hungry, and Barbara reached out and felt some Lucky Charms cereal when Petitioner was laying on top of her. *See* Record Exhibit 2.

Fourteen days after the CAC interviews, and at the request of law enforcement, the girls were examined at the CAC by Sexual Assault Nurse Examiner Kathy Lach. (6 RR 148) Kathy Lach testifies for the State in almost every Bowie County sexual assault trial, commonly drawing objections from defense counsel for her "90%" testimony. Lach routinely testifies, as she did in this case, that physical trauma is not present in 90% of sexual assault victims. (6 RR 138) Prior to Lach's testimony, Petitioner's trial counsel conducted a hearing outside of the jury's presence to obtain a ruling on whether Lach's routine "90%" testimony is reliable for purposes of providing an expert opinion on the same. (6 RR 16-36) Petitioner did not object to Lach's qualifications. The objection was that Lach's "90%" testimony is based on "junk science." (6 RR 36) The trial court permitted the testimony, most likely because Lach testified that she had performed over 500 sexual assault examinations and documented no physical trauma in 90% of those examinations. (6 RR 27)

9

Because Lach testifies that her examinations are performed for "medical diagnosis or treatment," she is able to tell juries what alleged sexual assault victims tell her about their history of abuse over hearsay objections. (6 RR 123) Here, unlike Barbara's recorded CAC interview, Lach testified that Barbara told her Petitioner assaulted her orally and anally, and that Petitioner penetrated her vagina. (6 RR 133-135) According to Lach, Barbara said that "milk," and not chocolate milk, came out of Petitioner's middle part when he put his middle part in her mouth. (6 RR 134) Unlike Tasha's recorded CAC interview, Lach testified that Tasha described oral, anal, and vaginal sexual assault, along with touching and digital penetration. (6 RR 136)

Lach's interviews with the girls were not recorded. Lach testified that her reports were based solely on what was relayed to her by the alleged victims, and her subsequent referrals for counseling are based solely on the history given by the alleged victims. (6 RR 153-154) Lach obtained no physical evidence from Barbara or Tasha, and her examination showed no physical trauma on either child. (6 RR 137, 153) While she may have explained to Barbara and Tasha that she would be writing down everything they said verbatim and that the girls were there for medical diagnosis or treatment, Lach did not tell either of the girls that a proper diagnosis depended upon the veracity of their statements. (6 RR 125)

CAC forensic examiner Hughes testified that Texas law requires children to take an oath during forensic interviews. (6 RR 195) Hughes testified in detail as to why children have a hard time testifying and remembering things, and that it is very common for children to have inconsistent stories. (6 RR 198-199) Hughes routinely compares police reports to her interviews and looks for "consistency" in core details. (6 RR 201) In this case, Hughes saw no signs of coaching, and Barbara and Tasha "appear[ed] to be testifying to something that they did, in fact, actually experience." (6 RR 203)

After this line of questioning, Petitioner's trial counsel objected and moved for a ruling that the State opened the door for cross-examination regarding the inconsistencies in the girls' stories of abuse without fear of Petitioner being attacked with extraneous offense witnesses the State had waiting to testify. The trial court denied Petitioner's motion, indicating Hughes' testimony did not open any doors. (6 RR 206-212)

Hughes also testified that her interviews are monitored by law enforcement, and that the interviews are set-up so they are "legally defensible" in court. (6 RR 217-219)

Prior to Tasha taking the stand, the State requested that Karrah Dickeson, the CAC Clinical Director, remain in the courtroom while Tasha and Barbara testified

because Dickeson was going to be an expert witness and she needed to observe the girls' testimony. (6 RR 220-221) Petitioner's trial counsel objected "until [he knew] the basis of why [Dickeson] needs to observe the testimony." (6 RR 221) Without requiring anything further from the State, the trial court overruled Petitioner's objection. (6 RR 221)

After a series of leading questions, Tasha testified that (1) she saw Petitioner's privacy when he sexually abused her; (2) Petitioner touched his privacy to her privacy; (3) Petitioner put his privacy in her mouth; (4) Petitioner put his privacy in her rear end; (5) she saw Petitioner sexually abuse Barbara; and (6) Petitioner showed her videos of people hunching. (6 RR 225-229) Petitioner's trial counsel played a portion of Tasha's recorded CAC interview outside of the jury's presence to refresh Tasha's recollection, but Petitioner's trial counsel did not cross-examine Tasha regarding her inconsistent allegations of abuse in fear of opening the door to extraneous offense evidence. (6 RR 238-244)

Barbara began her trial testimony by not being able to distinguish her right hand from her left hand, and she was confused with the difference between the truth and a lie. (6 RR 246, 250) Barbara testified that Petitioner put his hand on her private part, and "I think that's all." (6 RR 256) She didn't know if Petitioner's middle part touched her middle part, but she answered "yes" when asked if Petitioner's middle

part went in her middle part. (6 RR 256) Barbara testified that Petitioner's middle part went in her buttocks, and, while this was going on, the television was playing nasty movies with people hunching. (6 RR 257-259) Barbara testified that Tasha did not see Petitioner do these things because there was a curtain separating them. (6 RR 259)

According to Barbara, Petitioner had his underwear on when he put his penis in her mouth on Easter weekend. (6 RR 262) Milk came out of Petitioner's middle part and it went in her mouth. Barbara said it tasted like plain milk. (6 RR 263-264) Barbara testified that she was bleeding between her legs because Petitioner sexually abused her. (6 RR 265) Contrary to Tasha's CAC interview, Barbara testified that Petitioner never touched her between her legs in the car. (6 RR 266) Barbara did say that Petitioner told them they were his girlfriends as he abused them. (6 RR 268) According to Barbara, Petitioner asked Barbara if she liked the abuse and then spanked her when she said no. (6 RR 278)

Petitioner's trial counsel played Barbara's recorded CAC interview outside of the jury's presence to refresh Barbara's recollection. (6 RR 273) Petitioner's trial counsel cross-examined Barbara regarding several inconsistencies between the video and Barbara's trial testimony, but none of the cross-examination questions were related to the actual claims of abuse in fear of the State claiming the door was opened

13

to extraneous offense evidence. (6 RR 275-277) Although given the opportunity, Petitioner's trial counsel indicated he did not need to conduct a further proffer regarding the inconsistencies between the CAC interviews and the trial testimony. (6 RR 282) The recorded CAC interviews were offered as Record Exhibit 2.

Karrah Dickeson, who was permitted to observe both Barbara and Tasha testify, told the jury that the girls did not know words like "sexual abuse" before going to counseling. (7 RR 16) Dickeson testified that these words help children express themselves because they need to know what they experienced. (7 RR 17) She claimed that the girls struggled with avoidance, and that the abuse was very difficult for them to talk about. (7 RR 20-21) Dickeson was then able to inform the jury as to why Tasha had a difficult time testifying based solely on Dickeson's observations of her testimony. (7 RR 21-22) The State then attempted to introduce Barbara's and Tasha's statements for a fourth time through Dickeson, claiming the statements were made for medical diagnosis or treatment. (7 RR 22-24) Fortunately, the trial court sustained Petitioner's objection and did not permit Dickeson to testify as to what the girls told her.

Petitioner decided against testifying during the guilt/innocence phase. (7 RR 28) Immediately after Petitioner informed the trial court of his decision, the State informed the trial court that there were six extraneous victims prepared to testify

across the hall. (7 RR 30) The State reluctantly conceded that Petitioner did not open the door to this evidence during trial. (7 RR 33)

During final closing argument, the State instructed the jury to "go back there and fight for those little girls." Petitioner's trial counsel immediately objected in that it was improper for the State to instruct the jury to be an advocate for the State. The trial court overruled the objection. (7 RR 63-64)

During a recorded custodial interview, Petitioner voluntarily waived his right to counsel and vehemently denied abusing Barbara and Tasha. (10 RR at Record Exhibit 1) A redacted version of this interview was played for the jury. (6 RR 174) During pretrial hearings, Petitioner rejected all plea offers and said, "I don't care if they give me the death penalty, I didn't do it." (2 RR 5; 3 RR 11, 17-18) No DNA testing was performed on the girls, and law enforcement did not search the girls for hair samples. (6 RR 168) Lead Investigator Todd Aultman testified that no evidence was collected, and he didn't even attempt to look for the towel Barbara allegedly spit the "milk" into. (6 RR 179-180) Gloria Stokes, Petitioner's stepsister, testified that she saw Petitioner in a car on Easter weekend, but, because of the way Petitioner pulled up and left, she couldn't tell if the girls were in Petitioner's car or not. (7 RR 8) She later testified that no one was in the car with Petitioner on Easter weekend. (7 RR 10)

Nonetheless, the jury found Petitioner guilty on all six counts and sentenced him to LIFE in prison on each count. (7 RR 68; 9 RR 28-29)

B.     Direct Appeal

The court of appeals agreed that the State's improper comments during closing argument constituted a "plea for abandonment of objectivity," which did not "fall within the four categories of permissible jury argument." *Franklin v. State*, 2015 WL 1043804 at *9. The court also agreed that the trial court committed error by permitting Dickeson to remain in the courtroom in violation of the "Rule." *Id.* at *8. However, the court found both errors to be harmless.

Even though Hughes testified that the girls "appear[ed] to be testifying about something they did, in fact, actually experience," the court of appeals did not address whether this testimony opened the door to cross-examination of Hughes regarding the inconsistencies in the girls' stories because the issue was not preserved for appellate review. *Id.* at *7. The court did conclude that Lach's SANE reports were admissible over Petitioner's hearsay objections, and ultimately affirmed Petitioner's convictions and LIFE sentences.

## GROUND FOR REVIEW

Petitioner seeks review of the court of appeals' application of current Texas precedent regarding the admissibility of SANE reports over hearsay objections.

Specifically, when are trial courts permitted to "infer" that child claimants understand a proper diagnosis depends on the veracity of the statements they make to sexual assault nurse examiners?

## ARGUMENT AND AUTHORITIES

"Hearsay is not admissible except as provided by statute or [the Rules of Evidence] or by other rules prescribed pursuant to statutory authority." *Taylor v. State*, 268 S.W.3d 571, 578 (Tex.Crim.App. 2008); *citing* Tex. R. Evid. 802. Once the opponent of hearsay makes the proper objection, the burden shifts to the proponent of the evidence to establish an exception to the hearsay rule that would permit the admissibility of the evidence despite the fact that the evidence is hearsay. *Taylor* at 578-579; *citing Martinez v. State*, 178 S.W.3d 806, 815 (Tex.Crim.App. 2005) and *Cofield v. State*, 891 S.W.2d 952, 954 (Tex.Crim.App. 1994).

Here, although the SANE reports contained hearsay, the trial court concluded that the reports were admissible because the statements contained therein were made for purposes of medical diagnosis or treatment. (6 RR 127-128) Pursuant to Texas Rule of Evidence 803(4):

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> \*     \*     \*

17

**(4) Statements for Purposes of Medical Diagnosis or Treatment.** Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

In *Taylor*, this Court provided an in-depth analysis of the federal and Texas application of the hearsay exception found in Rule 803(4).

> We agree with the Austin Court of Appeals that, consistent with the rationale for admitting statements made for purposes of medical diagnosis or treatment over a hearsay objection, it is appropriate to require the proponent of the evidence to show that the out-of-court declarant was aware that the statements were made for that purpose and that **"proper diagnosis or treatment depends on the veracity of such statements."**...Absent such awareness on the declarant's part, we cannot be sure that the self-interested motive to tell the truth, making such statements sufficiently trustworthy to overcome a hearsay objection, is present.

268 S.W.3d at 589 (emphasis added).

This Court recognized that "reclining on a therapist's or psychiatrist's couch" is not the same as sitting in the emergency room in the immediate aftermath of an injury or on a physician's cold examination table in the interest of diagnosing and curing some exigent disease or ailment. 268 S.W.3d at 589. "This explains the almost universal tendency...to assay the record, not for evidence of such awareness, but for any evidence that would *negate* such an awareness, even while recognizing that the

18

burden is on the proponent of the hearsay to show that the Rule 803(4) exception applies." *Id.* (footnote citations omitted).

Further,

> In the therapist's office, however, this tacit presumption is far less compelling. It is not always so readily apparent (indeed, it may not always be *accurate*) in the mental-health context that truth-telling is vital. Not even an older, more mature child (maybe not even an adult) will necessarily recognize and appreciate the necessity (assuming there is a necessity) always to tell a mental-health provider the truth in order to assure the efficacy of treatment. In this context we think it is incumbent upon the proponent of the hearsay exception to make the record reflect both 1) that truth-telling was a vital component of the particular course of therapy or treatment involved, and 2) that it is readily apparent that the child-declarant was aware that this was the case. Otherwise, the justification for admitting the out-of-court statement over a valid hearsay objection is simply too tenuous.

268 S.W.3d at 590.

In footnote 95, the Court noted multiple cases in which Texas courts inferred that young children understood the need to be truthful when making statements to health care professionals. In footnote 70, the Court noted multiple cases in which Texas courts have held that out-of-court statements from child-victims were inadmissible under Rule 803(4) because there was no reason to believe that the child would (or even could) have appreciated that the purpose of the statement was to facilitate diagnosis or treatment.

In an unpublished opinion, the Amarillo Court of Appeals recently applied the *Taylor* rationale to SANE reports, reaffirming that the declarant must be made aware that a proper diagnosis or treatment depended on the veracity of the statements made to the SANE. *Lopez v. State*, 2014 WL 1267249 at *1 (Tex.App.—Amarillo 2014, pdr ref'd). In *Lopez*, the court ruled that the statements in the SANE report were admissible because

> [t]he record...revealed that [the SANE] informed the child 1) that she works for the hospital and takes care of children, 2) that "its real important for him to tell me the truth about what's going on so I know how to take care of him," and 3) that if he said his ear hurt but his stomach actually hurt, she would not be able to take care of him correctly. According to the same witness, the child victim knew both that he was there for medical diagnosis and treatment and that she used what was told to her for medical diagnosis and treatment.

2014 WL 1267249 at *1.

Here, Lach provided no evidence that she informed the girls that their proper diagnosis or treatment depended on the veracity of their statements. Lach testified that (1) she explained to the girls who she was; (2) she explained the nature of the exam; (3) the girls had an understanding that they were there for medical diagnosis or treatment; and (4) that she would be writing down everything they said verbatim. (6 RR 124-125) She did not, however, provide any testimony indicating that she informed the girls how important it was for them to tell the truth. Contrast this to

20

Melanie Hughes' testimony that Texas law requires children to take an oath to tell the truth during forensic interviews. (6 RR 195) The CAC interviews clearly show Hughes explaining the difference between the truth and a lie to both Barbara and Tasha in a "kid-friendly" environment. The State routinely gets people like Hughes qualified as experts in the field of forensic examination because these individuals are purportedly trained to make children so comfortable that they will tell the truth when they might not under other circumstances. Yet here the girls told extremely different stories to Hughes and Lach. Hughes' interviews were recorded; Lach's were not. Lach's examination was, according to her, conducted in a "kid-friendly" environment some eighteen days after the alleged abuse, and fourteen days after the girls' interviews with Hughes. (6 RR 162, 139) Hughes' interviews were conducted the day after the alleged outcries.

As noted in *Taylor*, the CAC's kid-friendly environment is not the same as sitting in the emergency room in the immediate aftermath of an injury, or on a physician's cold examination table in the interest of diagnosing and curing some exigent disease or ailment. 268 S.W.3d at 589. Therefore, the tacit presumption that the girls would be aware that Lach's questions were designed to elicit accurate information, and that their veracity would serve their best interests, is far less compelling.

21

Because the State provided no evidence that truth telling was a vital component of the SANE reports, Petitioner argued on direct appeal that the State failed to carry its burden of proving the admissibility of the SANE reports over Appellant's hearsay objections. The court of appeals disagreed, claiming that *Taylor* gives appellate courts the power to "infer from the record that the victim knew it was important to tell a SANE nurse the truth in order to obtain medical treatment or diagnosis." *Franklin v. State*, 2015 WL 1043804 at *6. However, in all contexts, *Taylor* requires, at the very least, that the proponent of the evidence show that the out-of-court declarant was aware that the statements were made for medical purposes *and* that proper diagnosis or treatment depends on the veracity of such statements.

In further support of its position, the court of appeals cited *Prieto v. State,* 337 S.W.3d 918, 921 (Tex.App.–Amarillo 2011, pet. ref'd); *Thomas v. State,* No. 03–11–00254–CR, 2013 WL 4516168, at *3 (Tex.App.–Austin Aug. 23, 2013, no pet.) (mem. op., not designated for publication); *Duckworth v. State,* No. 04–12–00077–CR, 2013 WL 3871058, at *1–2 (Tex.App.–San Antonio July 24, 2013, no pet.) (mem. op., not designated for publication); and *Bahle v. State,* Nos. 05–10–01057–CR & 05–10–01058–CR, 2012 WL 1382568, at *4 (Tex.App.–Dallas Apr. 23, 2012, no pets.). *Franklin v. State*, 2015 WL 1043804 at *6.

22

In *Prieto*, the Amarillo Court of Appeals cited *Taylor's* holding that (1) the proponent of the evidence must show that the declarant was aware that the statements were made for the purposes of medical diagnosis or treatment; and (2) that proper diagnosis or treatment depended on the veracity of the statements. 337 S.W.3d 918, 921 (Tex.App.—Amarillo 2011, pet. ref'd). This was the position taken by Petitioner on direct appeal.

*Prieto* did not, however, make any reference to the length of time between the outcry and the SANE. Here, the court of appeals specifically noted the following:

> On Wednesday, April 3, 2013, after the girls spoke to the responding officer, they were taken to the emergency room. At the hospital, Conesha spoke with a nurse who explained that it would be difficult to collect evidence because several days had passed since the alleged abuse. As a result, Conesha decided against subjecting the children to a sexual-assault examination. Instead, the children were taken to the Texarkana CAC on April 4, 2013, to undergo a forensic interview.
>
> ...It was not until April 18, 2013, that the children were taken to see outcry witness Kathy Lach, a SANE, for a medical examination conducted at the CAC.

*Franklin v. State*, 2015 WL 1043804 at *2.

Therein lies the basis for Appellant's point on appeal and this Petition for Discretionary Review. After the outcries, the girls were immediately taken to the emergency room where a SANE could have been performed on a cold examination table. This would have created the tacit presumption, or inference, of reliability.

23

However, after being informed by a medical professional that evidence collection was unlikely, the girls' mother decided against the examinations.

Over two weeks later, and at the request of law enforcement, Lach subjected these children to the invasive sexual assault examination even though she consistently testifies that over 90% of alleged victims never show signs of abuse. Unlike the sexual assault examinations in *Thomas*, *Duckworth*, and *Bahle*, which were all performed in the emergency room immediately after the outcry, these sexual assault examinations were admittedly conducted in a "kid-friendly" environment some eighteen days after the alleged abuse. Even if the unpublished opinions cited by the court of appeals allude to an inference that victims understand the importance of telling a SANE nurse the truth in order to obtain medical diagnosis or treatment, none of those decisions indicate that such an inference is applicable when a victim (1) is immediately taken to an emergency room; (2) refuses treatment; and (3) is then forced by law enforcement to undergo a sexual assault examination over two weeks later.

As per the express language of *Taylor*, the State should have been required to show not only that the girls' statements were made for medical diagnosis or treatment, but also that "proper diagnosis or treatment depend[ed] on the veracity of such statements." Here, the State did not produce such evidence, and to permit an "inference" of reliability when the SANE was conducted in what amounts to a

therapist's office over two weeks after the alleged abuse does not comply with the letter or spirit of this Court's extensive rationale in *Taylor*.

## PRAYER

**WHEREFORE**, Petitioner prays that this Court grant this Petition for Discretionary Review, thereby concluding that the SANE reports and any testimony regarding what Barbara and Tasha told the SANE nurse constituted impermissible hearsay. In doing so, and considering the cumulative nature of the trial court's errors, Petitioner prays that this Court will render verdicts of acquittal on all counts of conviction, or, in the alternative, that this Court will remand Petitioner's case back to the court of appeals with instructions to utilize the correct legal standards of review.

Respectfully submitted,

JASON HORTON LAW FIRM
114 West Broad Street
Texarkana, Texas 75501
*Mail To:*
Post Office Box 1596
Texarkana, Texas 75504
T-903-792-2000
F-903-792-2100
www.jasonhortonlaw.com

BY:   /s/ Jason Horton
      Jason Horton
      jason@jasonhortonlaw.com
      Texas Bar No. 24041130

ATTORNEY FOR PETITIONER

25

## CERTIFICATE OF COMPLIANCE

I certify that this document was prepared with Microsoft Word, and that, according to that program's word-count function, the sections covered by Tex. R. App. P. 9.4(i) contains 5,199 words.

/s/ Jason Horton
Jason Horton

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 8th day of June, 2015, the following have been completed:

1.      The original and eleven (11) copies of said petition have been filed with the Clerk of the Court of Criminal Appeals in accordance with the Texas Rule of Appellate Procedure 9.3(b)(1).

2.      A legible copy of said petition has been mailed by U.S. Mail to:

Mr. Jerry Rochelle
Bowie County District Attorney
Bowie County Plaza
601 Main Street
Texarkana, Texas  75501

Ms. Lisa McMinn
State Prosecuting Attorney
P.O. Box 13046
Austin, Texas  78711

/s/ Jason Horton
Jason Horton

# APPENDIX



# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-14-00046-CR
_____

LEAVELLE FRANKLIN, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 102nd District Court
Bowie County, Texas
Trial Court No. 13F1053-102

Before Morriss, C.J., Moseley and Carter,* JJ.
Opinion by Justice Moseley

_____

*Jack Carter, Justice, Retired, Sitting by Assignment

# OPINION

A jury convicted Leavelle Franklin of three counts of aggravated sexual assault of his seven-year-old daughter, Tasha Johnson (pseudonym), with two previous felony convictions.[1] Franklin pled true to the State's habitual-offender enhancement paragraph and was handed consecutive sentences of life imprisonment on each count. Franklin appeals his conviction on the grounds that the trial court erred (1) in admitting a Sexual Assault Nurse Examiner's (SANE) reports over his hearsay objection, (2) in limiting cross-examination of the forensic interviewer, which was designed to uncover inconsistencies in the victims' statements, (3) in exempting the Child Advocacy Center's (CAC) clinical director from the witness sequestration rule, and (4) by overruling his objection to comments made during the State's closing argument.

Here, because the SANE's reports constituted statements made for the purposes of medical diagnosis, we find that the trial court did not abuse its discretion in finding them admissible. We find that Franklin failed to preserve his second point of error related to the limitation of cross-examination. We also find harmless error (1) in exempting a witness from the witness sequestration rule and (2) in overruling Franklin's objection to the State's improper jury argument. Consequently, we affirm the trial court's judgment.

---

[1] In a separate indictment, the State alleged that Franklin also committed three counts of aggravated sexual assault of his six-year-old daughter, Barbara Johnson (pseudonym), with two previous felony convictions. The State joined both indictments in a single proceeding, which resulted in a total of six convictions and six sentences of life imprisonment. The trial court's sentences for the offenses committed against Tasha run concurrently with Franklin's sentences for the offenses committed against Barbara. In our cause number 06-14-00047-CR, Franklin appeals his three convictions for aggravated sexual assault against Barbara by raising the same grounds that are presented in this appeal.

## I.    The Evidence at Trial

At trial, Tasha's and Barbara's mother, Conesha, testified that she became aware that Franklin was abusing the girls after they stayed with him at his trailer during Easter weekend of 2013. According to Conesha, Franklin normally engaged in a cordial visit with her when returning the children to her possession. Thus, Conesha found it odd that after the Easter visitation ended on Sunday, March 31, 2013, Franklin simply dropped the children off at the doorstep, and the girls proceeded straight upstairs without greeting her. Unsure of the reason for the children's mood, Conesha did not pry until Tasha informed her that she had found blood on a tissue after using the restroom. On hearing Tasha's statement, Conesha became worried that Tasha might have been molested and asked her if Franklin had touched her inappropriately. According to Conesha, Tasha put her head down, acted as if she was scared, and shook her head no. Conesha, who sensed that Franklin "put like fear in [Tasha's] heart," decided not to push the issue.

Later that night, Conesha's longtime live-in boyfriend, Bobby Wells, returned to the house to find Conesha pacing. Conesha informed Wells of the "bad vibe" from the children's behavior and asked him to talk to the girls to see if they would say anything to him. Wells agreed to speak to the girls, who were asleep, after he returned from work on the following day. However, Conesha testified that before Wells had the chance to speak to the girls, Tasha approached her and told her that Franklin had touched her between the legs. When Wells returned home from work and received word of Tasha's statement, Wells decided to speak to the children individually.

3

When Wells asked Barbara what was wrong, she told him "daddy was being bad to us." Believing it possible that the girls had merely been disciplined, Wells asked whether they had been spanked. Both girls denied being spanked, but became very upset and started to cry. According to Wells, Barbara said that Franklin informed both girls that they were his girlfriends, told them to be quiet, "pulled his pants down and then pulled theirs down," and was "messing with [them]." Wells testified that Barbara told him that Franklin had made her put her mouth "on his thing." Pointing to her private, Barbara also said that Franklin "got on top of her and started hunching." According to Wells, Tasha made similar statements. She said that Franklin "put his hand down between her legs . . . and was trying to put his finger up in her, and then . . . he put her on her back[,] . . . got on top of her[,] . . . [and] told her that she was his new girlfriend." Wells became angry and left the house to cool down.

According to Conesha, while Wells was away, Tasha informed her that Franklin had put his penis in her mouth. When Wells returned, Wells and Conesha decided to call the police. On Wednesday, April 3, 2013, after the girls spoke to the responding officer, they were taken to the emergency room. At the hospital, Conesha spoke with a nurse who explained that it would be difficult to collect evidence because several days had passed since the alleged abuse. As a result, Conesha decided against subjecting the children to a sexual-assault examination. Instead, the children were taken to the Texarkana CAC on April 4, 2013, to undergo a forensic interview.

Melanie Hughes, a forensic interviewer at the CAC, testified that she interviewed Tasha and Barbara after she was assured that they knew the difference between a truth and a lie. While Hughes did not testify about specific statements made by the children during the interview, her

4

testimony suggested that the children had experienced sexual abuse. Because she did not observe any signs of coaching, Hughes testified that in her opinion, the girls appeared to be recounting events that they actually experienced.

It was not until April 18, 2013, that the children were taken to see outcry witness Kathy Lach, a SANE, for a medical examination conducted at the CAC. Lach testified that (1) she met with Tasha and Barbara, (2) she explained who she was and why she was there, and (3) she was assured that the children understood that the examination was for the purposes of medical diagnosis and treatment. Lach told the jury that she wrote the children's historical account verbatim, conducted a detailed genital examination of each child, and authored a report containing the statements made by each child. Over Franklin's hearsay objection, the trial court admitted the reports and allowed Lach to read their contents. Lach's report of Tasha's account stated,

> I wiped my bottom to keep me clean, and my bottom was bleeding. My daddy put his middle part up in my butt. He has done it a bunch of times. He did it when I was six and seven. He says don't tell anybody I did it, or he won't buy us anything. But I had to tell my mama. He put his middle part in my mouth and milk came out of it.

According to Lach's report, Barbara's account stated, "In the car, dad would reach back and touch our privacy. . . . He put his privacy in my mouth -- he put his privacy in my privacy, and he put his privacy in my behind. I would tell him no, and he'd put his privacy in my mouth." Without objection, Lach testified that during her interview, Tasha and Barbara both said that Franklin penetrated their mouths, vaginas, and anuses. Lach testified that her examination did

5

not reveal any trauma, but that the lack of physical trauma was not unusual based on her experience.

Tasha and Barbara both testified at Franklin's trial.[2] According to Tasha, Franklin told her and Barbara that they were his girlfriends. Tasha testified that Franklin showed her a "[n]asty movie . . . [with] women and men . . . [h]unching," and "put[ting] their middle part in the girl middle part." Tasha also testified that there were children in the movies and that adults were "hunching" on the children. Barbara also testified that Franklin showed her pornographic movies.

Using anatomically correct therapy dolls, both girls demonstrated the alleged acts that Franklin committed against them. Barbara testified that Franklin touched his penis to her vagina and put his penis in her mouth and anus. Barbara testified that the sexual abuse was painful and that she saw blood in her underwear after the acts. Barbara also testified that she saw Franklin sexually abusing Tasha. Tasha testified that Franklin touched her vagina with his hand, that he put his penis in her vagina, anus, and mouth, and that "[m]ilk" came out of Franklin's penis. Tasha testified that the sexual abuse was painful and caused her to bleed between her legs as a result. Tasha testified that the abuse had occurred on more than one occasion. Barbara and Tasha both testified that Franklin had instructed them to be quiet during the sexual abuse and warned them not to tell Conesha about the acts.

---

[2]Provided that the proper procedures are followed, the version of Article 38.37 of the Texas Code of Criminal Procedure that was in effect at the time of Franklin's trial provides for the admission of evidence that the defendant committed previous sexual offenses with any child victim in trials for sexual assault of child victims. The evidence is admissible for any bearing it has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant. TEX. CODE CRIM. PROC. ANN. art. 38.37 (West Supp. 2014). Here, Franklin's counsel acknowledged receipt of the State's Article 38.37 notice.

Karrah Dickeson, clinical director of the CAC, was allowed to remain in the courtroom to watch Tasha and Barbara testify, over Franklin's objection. Dickeson informed the jury that she treated the children and taught them to use the term sexual abuse during their therapy because they "need[ed] to know what it is that they have experienced." Dickeson testified that both children exhibited symptoms of traumatic stress.

After the State's closing argument, in which it told the jury to "[g]o back there and fight for those little girls," the jury found Franklin guilty on all counts.

## II. The SANE's Reports Were Admissible Hearsay

In his first point of error, Franklin argues that the trial court erred in overruling his hearsay objection to the SANE's reports. "A trial judge's decision on the admissibility of evidence is reviewed under an abuse of discretion standard and will not be reversed if it is within the zone of reasonable disagreement." *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011) (citing *Davis v. State*, 329 S.W.3d 798, 813–14 (Tex. Crim. App. 2010); *Russeau v. State*, 291 S.W.3d 426, 438 (Tex. Crim. App. 2009)).

Lach testified that she asks for patient history in order to focus the areas of the medical examination and to determine whether to test the patient for sexually-transmitted diseases. The State argued that under Rule 803(4) of the Texas Rules of Evidence, the statements in the reports were admissible because the examinations were conducted for the purpose of medical diagnosis and treatment, not for the purpose of law enforcement. *See* TEX. R. EVID. 803(4). At trial, Franklin objected to the State's offer of the SANE's reports on the ground that they included inadmissible hearsay, were not business records, were made for purposes of litigation, and

7

contained statements from the victims that could be characterized as hearsay within hearsay. The trial court overruled Franklin's objection.

In his first point of error on appeal, Franklin argues only that the trial court erred in admitting Lach's reports because she failed to testify that she informed Tasha and Barbara that a proper diagnosis depended on the veracity of their statements. The State argues that Franklin failed to preserve this complaint because it does not comport with the objection at trial. We disagree.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." TEX. R. EVID. 801(d). "Hearsay is not admissible except as provided by statute or [the Rules of Evidence] or by other rules prescribed pursuant to statutory authority." TEX. R. EVID. 802. There is no question that Lach's report included hearsay; the question is whether the hearsay was admissible. Here, Franklin lodged a hearsay objection. "Once the opponent of hearsay evidence makes the proper objection, it becomes the burden of the proponent of the evidence to establish that an exception applies that would make the evidence admissible in spite of its hearsay character." *Taylor v. State*, 268 S.W.3d 571, 578–79 (Tex. Crim. App. 2008).

The State specifically informed the trial court that it sought to utilize Rule 803(4), an exception that allows for the admission of qualifying hearsay statements. TEX. R. EVID. 803(4). The Rule provides,

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .

8

**(4)** **Statements for Purposes of Medical Diagnosis or Treatment.** Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or eternal source thereof insofar as reasonably pertinent to diagnosis or treatment.

*Id.* "This exception is based on the assumption that the patient understands the importance of being truthful with the medical personnel involved to receive an accurate diagnosis and treatment." *Bautista v. State*, 189 S.W.3d 368 (Tex. App.—Fort Worth 2006, pet. ref'd); *see Taylor*, 268 S.W.3d at 580.

Franklin's specific appellate argument that the reports were inadmissible because Lach failed to inform the children of the importance that they tell the truth is based on the Texas Court of Criminal Appeals' opinion in *Taylor*. *See generally Taylor*, 268 S.W.3d 571. *Taylor* looked to federal cases involving Rule 803(4) in deciding how to apply the law to non-medical professionals. *Id.* at 579. In examining several federal cases, *Taylor* noticed that more recent Eighth Circuit holdings

> emphasized the requirement that the record reflect, in cases involving child victims, both 1) that the physician (or counselor or psychologist) explained the importance of knowing the true identity of the assailant to the efficacy of the diagnosis or treatment and 2) that the child manifested an understanding of the need to be truthful.

*Id.* at 582 (citing *United States v. Gabe*, 237 F.3d 954 (8th Cir. 2001); *Olesen v. Class*, 164 F.3d 1096 (8th Cir. 1999)). *Taylor* agreed that

> consistent with the rationale for admitting statements made for purposes of medical diagnosis or treatment over a hearsay objection, it is appropriate to require the proponent of the evidence to show that the out-of-court declarant was aware that the statements were made for that purpose and that "proper diagnosis or treatment depends upon the veracity of such statements."

9

*Id.* at 588–89 (quoting *Jones v. State*, 92 S.W.3d 619, 623 (Tex. App.—Austin 2002, no pet.), *abrogated by Taylor*, 268 S.W.3d 571).

The veracity requirement addressed in *Taylor* is subsumed within Rule 803(4) and must be met by a party seeking to utilize this exception to Rule 802. It is clear from the record that the State sought admission of Lach's reports under Rule 803(4). Thus, we find that Franklin's hearsay objection, which followed the State's explanation of its desire to use Rule 803(4), was sufficient to preserve Franklin's complaint on appeal. *See Taylor*, 268 S.W.3d at 575–78 (deciding veracity issue in absence of specific objection). Because we find that Franklin's first issue is preserved, we address it on the merits.

To determine whether a child understands the importance of truthfulness when speaking to medical personnel, the reviewing court looks to the entire record. *See Green v. State*, 191 S.W.3d 888, 896 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). Although *Taylor* requires some showing that the declarant was made aware that proper diagnosis or treatment depended on the veracity of her statement, the method of meeting the requirement differs depending on whether the statement was made to a medical or non-medical professional, as expressed in the following excerpt:

> Still, we recognize that reclining on a therapist's or psychiatrist's couch is not quite the same as sitting in the emergency room in the immediate aftermath of an injury or on the physician's cold examination table in the interest of diagnosing and curing some exigent disease or ailment. In the latter contexts, it seems only natural to presume that adults, and even children of a sufficient age or apparent maturity, will have an implicit awareness that the doctor's questions are designed to elicit accurate information and that veracity will serve their best interest. This explains the almost universal tendency of courts under these circumstances to assay the record, not for evidence of such an awareness, but for any evidence that

10

would negate such an awareness, even while recognizing that the burden is on the proponent of the hearsay to show that the Rule 803(4) exception applies.

> In the therapist's office, however, this tacit presumption is far less compelling. It is not always so readily apparent (indeed, it may not always be accurate) in the mental-health context that truth-telling is vital. Not even an older, more mature child (maybe not even an adult) will necessarily recognize and appreciate the necessity (assuming there is a necessity) always to tell a mental-health provider the truth in order to assure the efficacy of treatment. In this context we think it is incumbent upon the proponent of the hearsay exception to make the record reflect both 1) that truth-telling was a vital component of the particular course of therapy or treatment involved, and 2) that it is readily apparent that the child-declarant was aware that this was the case. Otherwise, the justification for admitting the out-of-court statement over a valid hearsay objection is simply too tenuous.

*Taylor*, 268 S.W.3d at 589–90 (footnotes omitted). Thus, unlike statements made to non-medical professionals, which require affirmative evidence in the record on the issue of veracity, courts can infer from the record that the victim knew it was important to tell a SANE the truth in order to obtain medical treatment or diagnosis. *See Prieto v. State*, 337 S.W.3d 918, 921 (Tex. App.—Amarillo 2011, pet. ref'd); *see also Thomas v. State*, No. 03-11-00254-CR, 2013 WL 4516168, at *3 (Tex. App.—Austin Aug. 23, 2013, no pet.) (mem. op., not designated for publication); *Duckworth v. State*, No. 04-12-00077-CR, 2013 WL 3871058, at *1–2 (Tex. App.—San Antonio July 24, 2013, no pet.) (mem. op., not designated for publication); *Bahle v. State*, Nos. 05-10-01057-CR & 05-10-01058-CR, 2012 WL 1382568, at *4 (Tex. App.—Dallas Apr. 23, 2012, no pets.).[3]

---

[3]Although these unpublished cases have no precedential value, we may take guidance from them "as an aid in developing reasoning that may be employed." *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd).

11

Here, Lach testified that she identified herself as a nurse to Tasha and Barbara and explained that she was meeting with them to conduct a medical examination. Lach detailed the procedures of the examination to both children, and testified that in her opinion, the children understood that the examination was for medical diagnosis and treatment. Before asking Tasha and Barbara about their medical history, she informed them that she would be writing down their statements verbatim. After receiving their statements, Lach conducted a detailed genital examination of each child using a colposcope.

Reviewing the entire record, we conclude that the evidence is sufficient to support a finding that Tasha and Barbara understood the need to be truthful during Lach's medical examination. Accordingly, we conclude that the trial court did not abuse its discretion in finding that the statements contained within Lach's reports, as well as her testimony at trial, were admissible under Rule 803(4). We overrule Franklin's first point of error.

## III. Franklin Did Not Preserve any Issue Related to Limitation of Cross-Examination

Hughes testified that in her opinion, Tasha and Barbara did not exhibit any signs of coaching and "appear[ed] to be testifying to something that they did, in fact, actually experience."[4] After Hughes' direct examination, Franklin requested a brief hearing outside of the jury's presence. In *Bass v. State*, the Texas Court of Criminal Appeals held that when the

---

[4]Franklin did not object to Hughes' testimony at the time. "Expert testimony does not assist the jury, and thus is not admissible, if it constitutes 'a direct opinion on the truthfulness' of a child complainant's allegations." *Cantu v. State*, 366 S.W.3d 771, 777 (Tex. App.—Amarillo 2012, no pet.) (quoting *Yount v. State*, 872 S.W.2d 706, 708 (Tex. Crim. App. 1993)). "Expert testimony that a child did not exhibit indications of coaching or manipulation has been held not to constitute an opinion on the child's truthfulness." *Id.* (citing *Schutz v. State*, 957 S.W.2d 52, 73 (Tex. Crim. App. 1997); *Chavez v. State*, 324 S.W.3d 785, 788–89 (Tex. App.—Eastland 2010, no pet.); *Darling v. State*, 262 S.W.3d 920, 924 (Tex. App.—Texarkana 2008, pet. ref'd)); *Reynolds v. State*, 227 S.W.3d 355, 366 (Tex. App.—Texarkana 2007, no pet.).

defense opens the door by questioning a child's veracity, the State may be allowed to introduce the defendant's extraneous offenses for the purpose of disproving the defensive theory. *Bass v. State*, 270 S.W.3d 557, 562–63 (Tex. Crim. App. 2008).[5] At the hearing, Franklin (1) argued the inverse of *Bass* by claiming that because the State "directly put the child's veracity at issue," he should "be able to rebut it" without fear that the State would be allowed to discuss extraneous offenses, and (2) requested a ruling from the trial court on whether the State had opened the door to the issue of the children's veracity.[6] Attempting to understand Franklin's argument, the trial court stated, "You're saying the next witnesses they call, the next few witnesses they call, if you get into some things that would open the door, you want me to make a ruling on that now based on what she's testified to. I'm not going to do that." The trial court denied Franklin's preliminary motion for a ruling that the State had opened the door for him to essentially put on a defensive case of fabrication without fear of the State raising extraneous offenses to rebut the defensive theory. After the ruling, Franklin stated,

> And, Your Honor, just while we have the jury out, if the State hasn't done that by the time the children testify, I will need to make a proffer with both children at some point in time for if the door -- if I had received my ruling, the testimony we would have elicited, and I just want to let the Court know that.

On appeal, Franklin argues that the trial court limited his cross-examination and prevented him from raising inconsistencies in the children's testimony. We do not believe that Franklin preserved this issue for our review. First, we do not find that the trial court's

---

[5]We note that much has changed since *Bass* was issued, including the Section 2 amendments to Article 38.37 of the Texas Code of Criminal Procedure. *See* Act of May 17, 2013, 83d Leg., R.S., ch. 387, § 1, secs. 2, 2–a, 2013 Tex. Sess. Law Serv. 1168, 1169 (West) (effective Sept. 1, 2013).

[6]While Franklin's appellate brief argues the arguments raised by trial counsel, he has not cited to this Court any applicable authority supporting the arguments.

preliminary ruling—that the issue of the children's veracity had not yet been raised—was a ruling that specifically limited Franklin's cross-examination. *See* TEX. R. APP. P. 33.1(a). The strategic decision of how to approach the witnesses during cross-examination, including Hughes, was left open for Franklin.

In fact, the record demonstrates that Franklin pointed out several inconsistencies in Tasha's and Barbara's statements. During cross-examination, Tasha and Barbara both testified that they did not tell Hughes that Franklin showed them pornographic movies during the CAC interview. Barbara admitted that she did not tell Hughes about the acts of sexual abuse that she had reenacted for the jury using anatomically correct dolls and that she told Hughes that she bled from her private because Franklin had disciplined her with a belt. While Barbara testified that Franklin had abused her and Tasha in a car in the presence of another adult passenger, Tasha testified that the act did not occur. Even though the State had prepared for six victims of Franklin's previous extraneous offenses to testify had Franklin challenged the fact that those offenses had actually occurred, none of this extraneous-offense testimony was introduced. Thus, it appears that Franklin accomplished his goal of pointing out inconsistencies in the children's statements while avoiding admission of extraneous offenses.

Second, when an accused desires to elicit certain specific responses from a State's witness but is precluded from doing so by the trial judge, the record must contain an offer of proof in order to preserve error. *Duke v. State*, 365 S.W.3d 722, 725 (Tex. App.—Texarkana 2012, pet. ref'd); *see* TEX. R. EVID. 103(a)(2). "'The primary purpose of an offer of proof is to enable the appellate court to determine whether the exclusion was erroneous and harmful.' 'A

14

secondary purpose is to permit the trial judge to reconsider his ruling in light of the actual evidence.'" *Mays v. State*, 285 S.W.3d 884, 890 (Tex. Crim. App. 2009) (quoting 1 Steven Goode, et al., 1 *Texas Practice Series: Guide to the Texas Rules of Evidence* § 103.3 (2d ed. 1993)). Franklin argues that his cross-examination of Hughes and other witnesses was limited. However, although the trial court gave Franklin the opportunity to make an offer of proof, Franklin declined. "'When . . . there is no bill of exception or offer of proof to show the facts the defendant could have proved through cross-examination of an adverse witness, the issue has not been preserved for appellate review.'" *Lewis v. State*, 126 S.W.3d 572, 579 (Tex. App.—Texarkana 2004, pet. ref'd) (quoting *Jenkins v. State*, 948 S.W.2d 769, 775 (Tex. App.—San Antonio 1997, pet. ref'd)). It is unclear what further cross-examination of Hughes or the State's witnesses would have yielded.

We overrule Franklin's second point of error on appeal because we find that it is not preserved for our review.

## IV. Error in Exempting the CAC Director from the Witness Sequestration Rule Was Harmless

Prior to Tasha's and Barbara's testimony, the State asked if Dickeson, the CAC director and children's therapist, could be excused from the witness sequestration rule because she needed to review the children's testimony in order to offer her expert opinions. Franklin objected to Dickeson's exclusion from the witness sequestration rule and asked the State to explain why she would need to see the children testify. Without waiting for the State to answer, the trial court overruled Franklin's objection and allowed Dickeson to remain in the courtroom while Tasha and Barbara testified. Franklin argues that the trial court's ruling was erroneous.

15

A trial court's decision to permit a witness to remain in the courtroom after Rule 614 of the Texas Rules of Evidence (the witness sequestration rule) is invoked is reviewed for an abuse of discretion. *Moore v. State*, 882 S.W.2d 844, 848 (Tex. Crim. App. 1994).

> Rule 614 requires a trial court to exclude testifying witnesses from the courtroom unless the witness is (1) a party or the spouse of a party in a civil case, (2) an officer or employee of a legal entity named in the lawsuit who has been designated as the entity's representative for purposes of the trial, (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause, or (4) the victim in a criminal case, unless the victim is to testify and the court determines that the victim's testimony would be materially affected by hearing other trial testimony.

*Allen v. State*, 436 S.W.3d 815, 822 (Tex. App.—Texarkana 2014, pet. ref'd) (citing TEX. R. EVID. 614; *Bryant v. State*, 282 S.W.3d 156, 161 (Tex. App.—Texarkana 2009, pet. ref'd)). "The party claiming an exemption under the witness sequestration rule bears the burden of showing that the exemption applies." *Id.* (citing *White v. State*, 958 S.W.2d 460, 463 (Tex. App.—Waco 1997, no pet.)).

As we recently stated in *Allen*, "[a] conclusory statement that the witness' presence is 'essential and necessary' does not meet the burden to show that an exception under Rule 614 applies." *Id.* (citing *Bryant*, 282 S.W.3d at 161). Here, aside from claiming Dickeson as an expert witness, the State did not offer any reason why she was required to remain in the courtroom. Thus, Dickeson's exemption from the witness sequestration rule was erroneous.

However, unless the error in allowing Dickeson to remain in the courtroom affected Franklin's substantial rights, the error is harmless. *See id.* at 823 (citing *Bryant*, 282 S.W.3d at 161; *Russell v. State*, 155 S.W.3d 176, 181 (Tex. Crim. App. 2005)). To address the issue of harm in this circumstance, we consider (1) whether Dickeson actually heard Tasha's and

16

Barbara's testimony and (2) whether Dickeson's testimony "either contradicted the testimony of a witness from the opposing side or corroborated testimony of a witness she heard." *See id.* at 824 (citing *Bryant*, 282 S.W.3d at 161–62; *Wilson v. State*, 179 S.W.3d 240, 249 (Tex. App.— Texarkana 2005, no pet.)); *Cooks v. State*, 844 S.W.2d 697, 733 (Tex. Crim. App. 1992); *White*, 958 S.W.2d at 465; *see Webb v. State*, 766 S.W.2d 236, 239–40 (Tex. Crim. App. 1989). Franklin "has the burden to demonstrate that the record supports a finding under both prongs." *See Allen*, 436 S.W.3d at 824 (citing *Bryant*, 282 S.W.3d at 162). If both prongs are met, then the error "most likely resulted in harm." *Id.* However, the main "'question in assessing the harm of allowing [Dickeson] to remain in the courtroom is whether she was influenced in her testimony by the testimony she heard.'" *Id.* (quoting *Russell v. State*, 155 S.W.3d 176, 181 (Tex. Crim. App. 2005)).

Here, the record affirmatively demonstrates that Dickeson actually heard the children's testimony. However, the State's direct examination of Dickeson was limited to her qualifications and the fact that (1) she treated the children, (2) she taught them the term "sexual abuse" so that they would understand what they had experienced, (3) the children understood that they were receiving treatment, and (4) the children exhibited traumatic stress symptoms. The State's next line of questioning sought to have Dickeson divulge the substance of the statements Tasha and Barbara made to her during the course of the treatment. Essentially, the State desired to use Dickeson as another outcry witness. However, after the trial court sustained Franklin's objection to this line of questioning, the State rested its case. Thus, based on the record here, which demonstrates Dickeson's minimal usefulness as a witness in light of the trial

17

court's evidentiary ruling, we cannot conclude that Franklin established that Dickeson's testimony was influenced by Tasha's and Barbara's testimony.

Moreover, "'we need not reverse if, after examining the record as a whole, we have fair assurance that the error did not influence the jury's deliberations to appellant's detriment or had but a slight effect.'" *Id.* (quoting *Ladd v. State*, 3 S.W.3d 547, 566 (Tex. Crim. App. 1999)); *see* TEX. R. APP. P. 44.2(b). In light of the testimony of the State's other witnesses, including Tasha and Barbara, we have fair assurance that Dickeson's negligible testimony either did not influence the jury or had but slight effect. Consequently, we overrule Franklin's point of error.

## V. State's Improper Closing Argument Was Harmless

"We review a trial court's ruling on an objection to a jury argument for abuse of discretion." *Lemon v. State*, 298 S.W.3d 705, 707 (Tex. App.—San Antonio 2009, pet. ref'd); *see Davis v. State*, 329 S.W.3d 798, 825 (Tex. Crim. App. 2010); *Garcia v. State*, 126 S.W.3d 921, 924 (Tex. Crim. App. 2004); *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001). Franklin's complaint on appeal stems from the following portion of the State's closing argument:

> [BY THE STATE]: . . . .We got there. I got there. I told you on opening I was going to get there, and we got there this week. They did their part. You do your part by those girls now. They need you. You are all they have. They get one shot at this day, and you are all they have. ***Go back there and fight for those little girls.***[7]

---

[7]This opinion focuses solely on this sentence of the State's argument.

18

> [BY THE DEFENSE]: Objection, Your Honor. That's completely improper telling a jury to be an advocate for the State, individual jurors to advocate for the State's position back there.
>
> THE COURT: It's overruled.

(Emphasis added).

Franklin argues that the State's directive to the jury to "fight for those little girls" was improper. "Permissible jury argument falls into one of four categories: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) an answer to the argument of opposing counsel; or (4) a plea for law enforcement." *Cannady v. State*, 11 S.W.3d 205, 213 (Tex. Crim. App. 2000); *see Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). Because the State's comments clearly do not fit within the first three categories of permissible jury argument, the State argues that it made a plea for law enforcement.

"A proper plea for law enforcement may take many forms," including arguing the relationship between the jury's verdict and the deterrence of crime in general, or arguing the impact of the jury's verdict on the community. *Borjan v. State*, 787 S.W.2d 53, 55–56 (Tex. Crim. App. 1990) (per curiam). However, the State may not "argue that the community or any particular segment of the community expects or demands either a guilty verdict or a particular punishment." *Id.* at 56. "Jurors may not be representatives of the complainant, as opposed to representatives of the community; nevertheless, there is still pressure to accede to the demands and wishes of the prosecutor." *Dorsey v. State*, 709 S.W.2d 207, 210 (Tex. Crim. App. 1986).

19

Thus, there is little distinction between community demands and victim demands.[8] *Id.* Here, we find that asking the jury to "fight for those little girls" constituted "a plea for abandonment of objectivity," which does not fall within the four categories of permissible jury argument. *See Brandley v. State*, 691 S.W.2d 699, 712 (Tex. Crim. App. 1985); *Ayala*, 267 S.W.3d at 435–36; *see also People v. Nelson*, 890 N.Y.S.2d 189, 192 (N.Y. App. Div. 2009) (finding that "the prosecutor inappropriately attempted to appeal to the sympathy of the jury by asking the jury to 'fight for [the victim]' during deliberations").

However, we conclude that the State's comments were harmless. In reaching this conclusion, we apply the three factors established by the Court of Criminal Appeals in *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998), for analyzing harm from improper jury argument. The factors are: (1) severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks); (2) measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Id.*

The State's objectionable comments consisted of a few sentences and followed its proper discussion of the evidence and its argument that the evidence was sufficient to meet the elements of the alleged offenses. We conclude that the severity of the misconduct as measured by the prejudicial effect of the State's remarks is slight. The jury was reminded of the State's burden of

---

[8]Indeed, arguments suggesting that the jury should bow to victim demands run the risk of improperly seeking to evoke the jury's emotions. *See Dorsey*, 709 S.W.2d at 210; *Ayala v. State*, 267 S.W.3d 428, 435–36 (Tex. App.— Houston [14th Dist.] 2008, pet. ref'd); *Soto v. State*, No. 13-10-00013-CR, 2011 WL 5000393, at *12 (Tex. App.— Corpus Christi Oct. 20, 2011, no pet.) (mem. op., not designated for publication) (State's argument "The family needs justice" improperly sought to evoke jury's sympathy); *see also Mann v. State*, 718 S.W.2d 741, 746 (Tex. Crim. App. 1986) (assuming comment by State that "[w]e get one shot at [the defendant]" was improper).

20

proof prior to the State's closing argument and in the court's jury charge. Importantly, the strength of the evidence supporting the conviction was strong. Tasha's and Barbara's testimony alone was sufficient to support the jury's verdicts, and Franklin has raised no challenge to the legal sufficiency of the evidence. *See Allen*, 436 S.W.3d at 831. After examining the *Mosley* factors, we have fair assurance that the State's comments had little or no effect. *See Mosley*, 983 S.W.2d at 259–60. Accordingly, we overrule Franklin's last point of error.

## VI. Conclusion

We affirm the trial court's judgment.

Bailey C. Moseley
Justice

Date Submitted:     February 5, 2015
Date Decided:       March 10, 2015

Publish

21



# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-14-00047-CR

LEAVELLE FRANKLIN, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 102nd District Court
Bowie County, Texas
Trial Court No. 13F1054-102

Before Morriss, C.J., Moseley and Carter,* JJ.
Memorandum Opinion by Justice Carter

*Jack Carter, Justice, Retired, Sitting by Assignment

# MEMORANDUM OPINION

Leavelle Franklin appeals from his convictions of three counts of aggravated sexual assault of his six-year-old daughter, Barbara Johnson (pseudonym), with two previous felony convictions. Franklin has filed a single brief in which he raises issues common to all of his appeals.[1] Franklin argues that the trial court committed reversible error (1) in admitting a Sexual Assault Nurse Examiner's reports over his hearsay objection, (2) in limiting cross-examination of the forensic interviewer, which was designed to uncover inconsistencies in Barbara's and Tasha's statements, (3) in exempting the Child Advocacy Center's clinical director from the witness sequestration rule, and (4) by overruling his objection to comments made during the State's closing argument.

We addressed these issues in detail in our opinion of this date on Franklin's appeal in cause number 06-14-00046-CR. For the reasons stated therein, we likewise conclude that harmful error has not been shown in this case.

---

[1]In our case number 06-14-00046-CR, Franklin also appeals from his convictions of three counts of aggravated sexual assault of his seven-year-old daughter, Tasha Johnson (pseudonym), with two previous felony convictions.

We affirm the trial court's judgment.



                                        Jack Carter
                                        Justice

Date Submitted:     February 5, 2015
Date Decided:       March 10, 2015

Do Not Publish

Print this page

# Case # PD-0542-15

## Case Information

| | |
|---|---|
| Location | Court Of Criminal Appeals |
| Date Filed | 06/08/2015 07:41:18 PM |
| Case Number | PD-0542-15 |
| Case Description | |
| Assigned to Judge | |
| Attorney | Jason Horton |
| Firm Name | Jason Horton Law Firm |
| Filed By | Teresa Collins |
| Filer Type | Not Applicable |

## Fees

| | |
|---|---|
| Convenience Fee | $0.00 |
| Total Court Case Fees | $0.00 |
| Total Court Filing Fees | $0.00 |
| Total Court Service Fees | $0.00 |
| Total Filing & Service Fees | $0.00 |
| Total Service Tax Fees | $0.00 |
| Total Provider Service Fees | $0.00 |
| Total Provider Tax Fees | $0.00 |
| Grand Total | $0.00 |

## Payment

| | |
|---|---|
| Account Name | Jason Horton Law Firm |
| Transaction Amount | $0.00 |
| Transaction Response | |
| Transaction ID | 9176572 |
| Order # | 005592652-0 |

## Petition for Discretionary Review

| | |
|---|---|
| Filing Type | EFileAndServe |
| Filing Code | Petition for Discretionary Review |
| Filing Description | Leavelle Franklin's Petition for Discretionary Review |
| Reference Number | Franklin, Leavelle |
| Comments | |
| Status | Rejected |

### Fees

| | |
|---|---|
| Court Fee | $0.00 |
| Service Fee | $0.00 |

### Rejection Information

| Rejection Reason | Time | Rejection Comment |
|---|---|---|
| Other | 06/10/2015 09:52:31 | The petition for discretionary review does not contain a certification in compliance with T.R.A.P. 9.4(i)(3); it contains 5199 words exceeding the limit of 4500. You have |

AM           ten days to file a corrected petition.

## Documents

| | | |
|---|---|---|
| *Lead Document* | Franklin - PDR 06-08-15.pdf | [Original] |

## eService Details

| Name/Email | Firm | Service Type | Status | Served | Date/Time Opened |
|---|---|---|---|---|---|
| Jason Horton<br>jason@jasonhortonlaw.com | | EServe | Sent | Yes | 06/08/2015<br>07:49:15 PM |
| Jerry Rochelle<br>jrochelle@txkusa.org | | EServe | Sent | Yes | Not Opened |
| Lauren Sutton<br>lauren.sutton@txkusa.org | | EServe | Sent | Yes | 06/09/2015<br>04:46:38 PM |
| State Prosecuting Attorney<br>information@spa.texas.gov | | EServe | Sent | Yes | 06/09/2015<br>08:58:17 AM |